**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Timothy Coffey, | No. CV-18-0363-TUC-BGM |
| Plaintiff, | |
| v. | **ORDER** |
| Andrew M. Saul,[1] Acting Commissioner of Social Security, | |
| Defendant. | |

Currently pending before the Court is Plaintiff's Opening Brief (Doc. 18). Defendant filed his Brief ("Response") (Doc. 22), and Plaintiff filed his Reply (Doc. 23). Plaintiff brings this cause of action for review of the final decision of the Commissioner for Social Security pursuant to 42 U.S.C. § 405(g). The United States Magistrate Judge has received the written consent of both parties, and presides over this case pursuant to 28 U.S.C. § 636(c) and Rule 73, Federal Rules of Civil Procedure.

**I.  BACKGROUND**

*A.  Procedural History*

On March 28, 2014, Plaintiff protectively filed a Title II application for Social Security Disability Insurance Benefits ("DIB") and on January 23, 2015 filed a Title XVI application for Supplemental Security Income ("SSI"), with both applications alleging

---

[1] The Court takes judicial notice that Nancy A. Berryhill is no longer Acting Commissioner of the Social Security Administration ("SSA"). The Court will substitute the new Commissioner of the SSA, Thomas M. Saul, as Respondent pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. *See also* Fed. R. App. P. 43(c)(2).

disability as of January 25, 2009 due to bipolar disorder, agoraphobia, anxiety and panic disorder, and Hidradenitis suppurativa. *See* Administrative Record ("AR") at 27–29, 56, 115–16, 123–24, 136–37, 215, 222, 245, 249, 277, 280, 307. The Social Security Administration ("SSA") denied this application on September 9, 2014. *Id.* at 27, 114–20, 149–51. On January 23, 2015, Plaintiff filed a request for reconsideration, and on April 24, 2015, SSA denied Plaintiff's application upon reconsideration. *Id.* at 27, 121–57. On June 16, 2015, Plaintiff filed his request for hearing. *Id.* at 27, 160–61. On May 15, 2017, a hearing was held before Administrative Law Judge ("ALJ") Lori L. Freund. *Id.* at 27, 52–113. On August 17, 2017, the ALJ issued an unfavorable decision. AR at 24–45. On October 5, 2017, Plaintiff requested review of the ALJ's decision by the Appeals Council, and on June 7, 2018, review was denied. *Id.* at 1–3, 214. On July 26, 2018, Plaintiff filed this cause of action. Compl. (Doc. 1).

### *B.    Factual History*

Plaintiff was forty-three (43) years old at the time of the administrative hearing and thirty-five (35) at the time of the alleged onset of his disability. AR at 27, 43, 52, 114, 121, 123, 136, 215, 222, 245, 277, 307. Plaintiff obtained a high school diploma. *Id.* at 43, 114, 121, 250. Prior to his alleged disability, Plaintiff worked as a department manager at Costco. *Id.* at 91–93, 250, 255–56.

#### 1.    **Plaintiff's Testimony**

##### a.    **Administrative Hearing**

At the administrative hearing, Plaintiff testified that in 2009 he left work at Costco Wholesale and went on Short-Term Disability. AR at 72–73. Plaintiff was on Short-Term Disability for six (6) months and treated by his primary care physician, Dr. Stanley Ling. *Id.* at 73. Plaintiff testified that he was subsequently approved for a twelve (12) month term of Long-Term Disability. *Id.* Plaintiff further testified that his Long-Term Disability ended in June 2010. *Id.* at 75. Plaintiff also testified that his medical insurance ended at that time and he did not apply for State assistance. *Id.* Plaintiff testified that although he was seen by Jim Harden, a mental health counselor, for approximately two (2) years, he

was unable to obtain records from that time. AR at 76–77. Plaintiff estimated that he ceased seeing Mr. Harden in April 2012. *Id.* at 78.

Plaintiff testified that his drinking became a problem in December 2013. *Id.* Plaintiff estimated that he was drinking somewhere between seven (7) and twelve (12) or thirteen (13) shots of alcohol per day. *Id.* at 79. Plaintiff further testified that he went into treatment in December 2014. *Id.* Plaintiff noted that he sought treatment because he realized that his drinking had become a progressive problem that would not improve. AR at 79–80. Plaintiff also indicated that his wife at the time was a heavy drinker. *Id.* at 80.

Plaintiff testified that he stopped therapy in September 2015 because he was uninsured and reliant on his parents for housing. *Id.* at 81. Plaintiff further testified that shortly thereafter he applied state benefits. *Id.* at 82. Plaintiff also testified that at the time of the hearing he was receiving food and medical assistance. *Id.* at 82. Plaintiff testified that he did not have a good reason for not seeking treatment beyond difficulty leaving the house or motivating to make a telephone call. AR at 82–83. Plaintiff indicated that these issues have grown progressively worse since 2009. *Id.* at 83. Plaintiff described attempting to reengage with the world by going grocery shopping, but at times has to leave his shopping cart at the store and just leave because he cannot be around people. *Id.* at 83–84. Plaintiff testified that he is taking an anti-anxiety medication and has an albuterol rescue inhaler. *Id.* at 84–85. Plaintiff further testified that he had been prescribed antibiotics to help with the Hidradenitis suppurativa, but the course had been completed at the time of the hearing. *Id.* at 85–86.

Plaintiff testified that his Hidradenitis suppurativa causes "incredible pain" and "fuel[s] the depression and anxiety" which has resulted in his inability to work. AR at 87. Plaintiff further testified that he has had Hidradenitis suppurativa since he was 13. *Id.* Plaintiff also testified that the condition has worsened with more frequent outbreaks, larger cysts, and cysts in new places. *Id.* at 87–88, 91. Plaintiff explained that he managed the condition while working by bringing multiple changes of clothes each day and taking breaks to clean up and change outfits. *Id.* at 92–94. Plaintiff described the cysts as large,

painful, and filled with blood and pus. *Id.* at 91. Plaintiff explained that aside from antibiotics, Hidradenitis suppurativa treatment includes hot baths or hot compresses. AR at 92. Plaintiff testified that ultimately, he went on disability due to anxiety. *Id*. at 88–89. Petitioner opined that he believes that his anxiety is exacerbated by the Hidradenitis suppurativa. *Id.* at 90.

Plaintiff further testified that because of the combination of depression, anxiety, and pain, he does not socialize beyond his parents and sister. *Id.* at 94–95. Plaintiff also testified that he had recently had a seizure while driving, but had not yet seen the neurologist for treatment beyond the emergency department. *Id*. at 95–98. Plaintiff indicated that he is no longer driving as a result of this episode. AR at 98.

### b. Administrative Forms

#### *i. Function Report—Adult*

On February 11, 2015, Plaintiff completed a Function Report—Adult in this matter. AR 296–303. Plaintiff reported that he lived in a house with his parents. *Id.* at 296. Plaintiff described his medical conditions as follows:

> Extreem [sic] depression, anxiety (panic-attacks), fear of leaving the house. Cannot focus enough to complete minimal tasks around the house. Cannot cope with "surprise or last minute" life situations. Fear of phone calls, doorbell/knock and mail because it might be bad news. I'm easily iratated[sic]/agitated by small things in life that do not bother others.

*Id.* Plaintiff reported that on good days he tries to help around the house with dishes and laundry, but on most days he isolates himself and tries to read or watch television. *Id.* at 297. Plaintiff further reported attending Alcoholics Anonymous meetings daily. *Id.* at 297, 300. Plaintiff also reported that he cares for his son and sometimes feeds his parents' dog. AR at 297.

Plaintiff indicated that prior to his illness he was able to focus and complete tasks, including managing up to eighty (80) people, run a business, and be in public without panic attacks or fear. *Id*. Plaintiff reported that now his sleep is irregular, both in ability to go to sleep and its duration. *Id*. Plaintiff indicated a lack of motivation regarding his personal

hygiene, but is capable to attending to all personal care tasks. *Id.* Plaintiff reported that his parents remind him to take his medication. *Id.* at 298. Plaintiff further reported that he can prepare simple meals, such as sandwiches and frozen foods. AR at 298. Plaintiff noted that prior to the onset of his condition, he would cook large, complicated meals, but now he cannot focus. *Id.* Plaintiff also reported that he does his own laundry, does the dishes, and occasionally mows the lawn. *Id.* Plaintiff indicated that he performs these tasks once or twice per week, and occasionally needs help. *Id.*

Plaintiff noted that he goes outside to smoke daily. *Id.* at 299. Plaintiff further reported that if he goes out for other reasons he walks or rides in a car, but does not drive. AR at 299. Plaintiff also reported that he shops for food two (2) or three (3) times per month, but tries to hurry through the store. *Id.* Plaintiff prefers to have someone with him when he goes out. *Id.* Plaintiff reported that he can count change, but cannot pay bills and does not have a checking or savings account. *Id.* Plaintiff noted that since his condition arose, he was spending money excessively. *Id.*

Plaintiff indicated his hobbies include playing guitar, reading, watching television, and playing ball with his sons. AR at 300. Plaintiff reported that he does not do these things often due to a lack of desire or motivation. *Id.* Plaintiff further reported interacting with his parents and sons and occasional telephone calls. *Id.* Plaintiff attends church in addition to AA meetings. *Id.* Plaintiff also reported that he mostly does not want to talk to anyone and is irritable and angry. *Id.* at 301. Plaintiff reported that his conditions affect his ability to lift, reach, walk, remember, complete tasks, concentrate, understand, follow instructions, and get along with others. AR at 301. Plaintiff described his walking as limited by his Hidradenitis suppurativa, noting that when it flares he can only walk a few feet at a time before requiring a few seconds to a few minutes of rest before continuing. *Id.* Plaintiff further reported being able to pay attention for a minute or two, but does okay with spoken instruction, while needing to re-check written instructions. *Id.*

Plaintiff reported having no trust in the police or court system. *Id.* at 302. Plaintiff also reported that he has never been fired from a job because he cannot get along with

people. *Id.* Plaintiff indicated that he has difficulty with stress and changes in routine. AR at 302. Plaintiff noted that he wears glasses. *Id.* Plaintiff listed medications included quetiapine, sertraline, and lamotrigine. *Id.* at 303. Plaintiff described pain from Hidradenitis suppurativa adding to his depression and noted that he has bipolar disorder, as well. *Id.*

### *ii. Work History Report*

Plaintiff also completed a Work History Report. AR at 255–61. Plaintiff listed his prior work as a department manager in a wholesale retail business. *Id.* at 255. Plaintiff described the position as managing people and doing budget and sales planning. *Id.* at 256. Plaintiff further described the position as forty (40) hours per week and "like running a business inside a business." *Id.* Plaintiff reported that the job required the use of machines, tools, or equipment; technical knowledge or skills; and writing or completing reports or similar duties. *Id.* Plaintiff further reported that while working, he walked, stood, sat, stooped, kneeled, crouched, crawled, and handled, grabbed or grasped large objects for eight (8) hours per day; reached for six (6) hours per day; and wrote, typed, or handled small objects for three (3) hours per day. AR at 256. Plaintiff described lifting items such as tires, cases of water, or other merchandise. *Id.* Plaintiff further described the position as requiring him to lift fifty (50) pounds frequently, and the heaviest weight he lifted was 100 pounds or more. *Id.* Plaintiff reported that he was a lead worker who supervised 120 people for eight (8) hours per day. *Id.*

### *iii. Disability Report—Appeal*

Plaintiff had a Disability Report—Appeal completed indicating that he suffered "massive depression, anxiety, fear of leaving the house, [and a] fear of being around other people." AR at 280. Plaintiff also reported that he had been abusing alcohol in an effort to self-medicate, which resulted in hospitalization. *Id.*

. . .

. . .

. . .

## 2. **Plaintiff's Medical Records**[2]

On June 25, 2009, Plaintiff was seen by Stanley Ling, M.D. regarding a flare-up of his Hidradenitis suppurativa and reported being under a lot of stress. AR at 511. Dr. Ling sought a work excuse for the next eight (8) weeks "due to stress reaction and uncompensated depression." *Id.* On August 4, 2009, Plaintiff returned to Dr. Ling for a follow-up, but treatment records only discuss his depressive symptoms. *Id.* at 512. On October 9, 2009, Plaintiff was seen by James Harden, LICSW for an initial consultation. *Id.* at 362–66. Treatment records noted Plaintiff having had Hidradenitis suppurativa since his mid-teens. *Id.* at 362. Plaintiff reported painful eruptions under his arms. AR at 362.

On December 10, 2009, Plaintiff saw Mr. Harden regarding an increase in his anxiety and depression. *Id.* at 353. Treatment notes indicate that Plaintiff's concerns included pain management and depression. *Id.* Mr. Harden wrote "hydradentitis suporativa" in the margin. *Id.* Mr. Harden additionally noted that Plaintiff's "physical condition and pain associated has increased his depression." *Id.* at 354. Finally, Mr. Harden noted that "a professional conflict has developed[,]" and he would no longer be treating Plaintiff. AR at 345. Therefore, Mr. Harden referred Plaintiff to another therapist. *Id.*

On September 4, 2013, Plaintiff was seen by Hilda Gaton, MA at Reliance Medical Clinics PLLC. *Id.* at 368–76. Intake records indicated that Plaintiff reported chronic severe pain and discomfort from Hidradenitis suppurativa which aggravates his depressive symptoms. *Id.* at 368, 372. On November 21, 2014, Plaintiff was seen at Kennewick General Hospital regarding chest pain. *Id.* at 393–410. Treatment records included Hidradenitis suppurativa in the "Problem List"; however, no further mention was made. AR at 395.

On January 21, 2015, Plaintiff was seen by Rinah Gutierrez, M.D. for treatment of his depression, anxiety, and fears of being in public places. *Id.* at 454–57. Dr. Gutierrez

---

[2] The Court has reviewed the entirety of Plaintiff's medical records; however, Plaintiff's arguments are limited to issues regarding Hidradenitis suppurativa. *See* Opening Br. (Doc. 18) at 3. As such, the Court's summary is limited to records relevant to that condition.

noted Plaintiff's diagnosis of Hidradenitis suppurativa since his teenage years and treatment by antibiotics and pain medication in his history. *Id.* at 455, 457. Dr. Gutierrez made no further mention of the condition. *See id.* at 454–57. On February 5, 2015, Plaintiff was seen by Dr. Gutierrez for treatment of his depression and anxiety. *Id.* at 452–53. Dr. Gutierrez listed Hidradenitis suppurativa as a medical diagnosis and noted that "physical pain can contribute to [Plaintiff's] depression, while depression itself can also worsen the pain." AR at 453.

On May 6, 2015, Plaintiff was seen by Elie Levy, M.D., in Seattle, for treatment of his Hidradenitis suppurativa. *Id.* at 463–64. Dr. Levy's impression included "[c]lassic hidradenitis suppurativa with sinus tract formation." *Id.* at 463. Dr. Levy noted Humira as a possible treatment in addition to surgery. *Id.* Dr. Levy further noted that her offices would be able to treat the axillary lesions, but his other lesions required removal by a urologist and general surgeon. *Id.* Plaintiff indicated his preference for the additional surgeries to occur in the Tri-Cities area. AR at 463. On May 21, 2015, Dr. Levy removed an abscess from Plaintiff's left axilla and injected steroid medication into eleven (11) different lesions. *Id.* at 462, 466–67. On June 2, 2015, Dr. Levy informed Plaintiff that the abscess on his left axilla had been removed with clear margins and no further treatment was needed at that time. *Id.* at 465. On the same date, Plaintiff was seen by Paul Maiocco, PA-C in the Tri-Cities for suture removal. *Id.* at 527. PA Maiocco noted that the area appeared red and inflamed, and the sutures were pulled apart. *Id.* PA Maiocco referred Plaintiff to the Emergency Department for further evaluation and treatment. *Id.* Plaintiff was then seen by Marvin Roman, M.D. at Columbia Center Urgent Care. AR at 541–43. Dr. Roman cleaned and irrigated the wound and prescribed Keflex for the persistent infection. *Id.* at 543. On June 5, 2015, Plaintiff was seen by Jessica Barajas, MA-C for wound cleaning and re-packing. *Id.* at 539–40. On June 7, 2015, MA Barajas again cleaned and re-packed Plaintiff's wound. *Id.* at 538. On June 10, 2015, Plaintiff was seen by Brandy Kirkendall, MA-C for wound cleaning and re-packing. *Id.* at 537. On June 15, 2015, Plaintiff was seen by Helen Mitchell, MA-C for a wound check and care. AR at 536.

On June 18, 2015, Plaintiff was again seen by MA Mitchell for a dressing and packing change of the wound from his cyst removal. *Id.* at 535. MA Mitchell noted the wound's improved appearance. *Id.* On June 22, 2015, Plaintiff was seen by Olesya Melnik, MA-C for a recheck of Plaintiff's incision and drainage wound on his left axilla. *Id.* at 534. MA Melnik reported that the wound was healing nicely without signs or symptoms of infection. *Id.*

On July 16, 2016, Plaintiff was seen by Travis Henderson, PA-C for ear pain. AR at 524–26. PA Henderson's assessment included cerumen impaction in the right ear, bronchospasm, and Hidradenitis suppurativa. *Id.* at 525. PA Henderson prescribed an antibiotic and hydrocodone-acetaminophen for pain. *Id.* On September 3, 2016, Plaintiff was seen by Robert Marshall, M.D. for his Hidradenitis suppurativa. *Id.* at 473–76. Dr. Marshall noted that Plaintiff had failed antibiotics, and Humira initiation was recommended. *Id.* at 473, 475. Dr. Marshall also directed that Plaintiff soak in a bath tub of water with a cup of bleach and several drops of dish soap for ten (10) minutes and then rinse off. AR at 474, 476. This treatment was to be repeated for two (2) days. *Id.*

### 3. **Medical Expert Donna M. Veraldi's Testimony**

Donna M. Veraldi, Ph.D. testified as a psychological expert at the administrative hearing. AR at 27, 62–72. Dr. Veraldi testified that she had reviewed Plaintiff's medical records prior to the hearing. *Id.* at 63. Based on those records, Dr. Veraldi found evidence for the "diagnosis of a major depressive disorder, recurrent and moderate which is a 12.04, some manic symptoms and some panic." *Id.* at 67. Dr. Veraldi further testified that she did not believe these diagnoses met or equaled a listing. *Id.* Dr. Veraldi also testified that the records did not contain a lot of information regarding B criteria. *Id.* Based on the information available to her, Dr. Veraldi opined that Plaintiff had moderate restriction in his ability to understand, remember, or apply information; interact with others; and concentration, persistence, or pace. AR at 67–68. Dr. Veraldi further opined that Plaintiff had a mild restriction in his ability to adaptive management of himself. *Id.* at 68. Dr. Veraldi was unable to find any C criteria involvement based on Plaintiff's apparently

abbreviated time in treatment. *Id.* Dr. Veraldi confirmed that her opinion encompassed a two-year timeframe between September 2013 through September 2015 and that there was insufficient information for an opinion prior to and after that date range. *Id.* at 69. Dr. Veraldi noted that she could confirm that Plaintiff's medical records from 2009 indicate that Plaintiff was receiving treatment for depression and anxiety, but expressed no further opinion. *Id.* at 70.

### 4. Vocational Expert K. Diane Kramer's Testimony

Ms. K. Diane Kramer testified as a vocational expert at the administrative hearing. AR at 27, 98–112. Ms. Kramer described Plaintiff's past relevant work as a department manager in the retail industry, Dictionary of Occupational Titles ("DOT") number 299.137-010, with a Specific Vocational Preparation ("SVP") of 7—skilled, and an exertional level of medium. *Id.* at 101–102.

The ALJ asked Ms. Kramer to consider a hypothetical individual between the ages of thirty-nine (39) and forty-one (41), without exertional limitation, but who should avoid any type of work involving dealing with the general public, could have occasional interaction with co-workers and supervisors, would work best away from any tandem tasks, should avoid any type of fast-paced production work where there is a time quota involved, and would require access to a restroom. *Id.* at 102–03. Ms. Kramer testified that such an individual would not be able to perform the past relevant work, primarily because of not dealing with the public and no tandem tasks. *Id.* at 103. Ms. Kramer further testified that such an individual would be able to perform other work, such as an industrial cleaner, DOT number 381.687-018, with an SVP of 2, and medium exertional level, and approximately 541,000 jobs in the national economy. *Id.* Ms. Kramer also suggested the hypothetical individual could work as a mail clerk, DOT number 222.687-022, with an SVP of 2, and light exertional level, and 345,000 jobs in the national economy. AR at 103. Ms. Kramer's third suggestion was small parts assembler, DOT number 706.684-022, with an SVP of 2, and light exertional level, and approximately 207,000 jobs in the national economy. *Id.*

The ALJ added to her hypothetical individual that such an individual would need to

avoid unprotected heights, commercial driving, and climbing ladders, ropes, or scaffolds. *Id.* The ALJ then enquired whether those additional limitations would alter the availability of the previously listed jobs. *Id.* Ms. Kramer confirmed that the same three (3) jobs would be available. *Id.* Ms. Kramer also clarified that the mail clerk position, based on her experience and observation, would not involve the use of machines and would be away from the storefront or loading area. AR at 104.

Plaintiff's counsel then further reduced the exertional level that the ALJ's hypothetical individual would be capable of to sedentary work with a sit/stand option at their leisure. *Id.* at 105. Ms. Kramer testified that the previously suggested jobs would be eliminated. *Id.* Plaintiff's counsel asked if there were other jobs available in the national economy. *Id.* Ms. Kramer confirmed that there would be and testified that such an individual would be able to work as a charge account clerk, DOT number 205.367-014, with an SVP of 2, and sedentary exertional level, and approximately 205,000 jobs in the national economy. *Id.* Ms. Kramer further testified that another possible job would be printed circuit board assembly, DOT number 726.684-110, an SVP of 2, sedentary exertional level, and with approximately 224,000 jobs in the national economy. *Id.* at 105, 109. Ms. Kramer also testified regarding the availability of document preparer, DOT number 249.587-018, with an SVP of 2, sedentary exertional level, and with approximately 201,000 jobs in the national economy. AR at 106. Ms. Kramer clarified that the printed circuit board assembler was quota based, in that a certain number of items needed to be produced, but there was not a specific timeframe, such as items passing on a conveyor belt. *Id.* at 106–107, 109–10.

Plaintiff's counsel further inquired as to an employer's tolerance for an individual's off-task production before employment would be jeopardized. *Id.* at 111. Ms. Kramer testified that based on her experience, an employer would tolerate between five (5) and ten (10) percent of the workday off task. *Id.* Ms. Kramer further opined that an employer will generally tolerate one (1) missed day per month within unskilled work. *Id.* Ms. Kramer further opined, based on her experience, that an individual who has issues with arriving

late or leaving early is given three (3) warnings and then terminated. *Id.* Ms. Kramer also opined that if an employee is noticeably off task early in employment, it may cause an issue with the employer. AR at 112. Ms. Kramer testified that her testimony was consistent with the DOT and based on the national economy. *Id.* at 99.

### 5. **Lay Witness Testimony**

On February 11, 2015, Aloha Coffey, Plaintiff's mother, completed a Function Report—Adult—Third Party. AR at 286–93. Mrs. Coffey reported that Plaintiff lives in a house with her and his father. *Id.* at 286, 293. Mrs. Coffey described Plaintiff's daily activity as attending Alcoholics Anonymous meetings and seeking medical and psychiatric help, but that he did very little physical activity. *Id.* at 287. Mrs. Coffey reported that Plaintiff performed household chores occasionally. *Id.* Mrs. Coffey further described that prior to his illness, Plaintiff was able to work full-time and have a family and social life. *Id.*

Mrs. Coffey described Plaintiff's sleep as irregular. AR at 287. Mrs. Coffey also reported Plaintiff as inattentive to his personal care, including not bathing or changing clothes for several days and having a low appetite. *Id.* Mrs. Coffey noted that Plaintiff needs reminders to perform personal hygiene, as well as to take his medications. *Id.* at 288. Mrs. Coffey reported that Plaintiff could make sandwiches and cook a complete meal if someone was helping him. *Id.* Mrs. Coffey indicated that he cooks two (2) or more times per week. *Id.* Mrs. Coffey further reported Plaintiff did dishes, laundry, and made the bed regularly, but sometimes needed reminding. AR at 288.

Mrs. Coffey also reported that Plaintiff only went outside when required and would walk or ride in a car. *Id.* at 289. Mrs. Coffey further noted that Plaintiff has a fear of being in public alone and did not drive. *Id.* Mrs. Coffey reported that Plaintiff shopped in stores for food and clothing, but tried to go early or late to avoid people. *Id.* Mrs. Coffey further reported that Plaintiff could not pay bills, count change, handle a savings account, or use a checkbook or money orders because he had no money. *Id.* Mrs. Coffey noted that Plaintiff increased his spending as a result of his conditions. AR at 290.

Mrs. Coffey described Plaintiff's hobbies as reading and watching television, which he does daily. *Id.* Mrs. Coffey also noted that Plaintiff's social activities include using the telephone or texting, and going to church and AA. *Id.* Mrs. Coffey indicated that Plaintiff is uncomfortable alone in a crowd, but becomes frustrated in conversation or being around others. *Id.* at 290–91. Mrs. Coffey reported Plaintiff's conditions as affecting his memory, concentration, understanding, ability to follow instructions, use his hands, and get along with others. *Id.* at 291. Mrs. Coffey further reported that Plaintiff could pay attention for a few seconds to a few minutes, and if he is not distracted can follow written and spoken instruction well. AR at 291. Mrs. Coffey noted Plaintiff's distrust of the police and court system. *Id.* at 292. Mrs. Coffey also noted that Plaintiff does not handle stress or changes in routine well. *Id.* Mrs. Coffey explained that Plaintiff wants to get back to who he was; however, he needs assistance because he has no income and his parents are his sole support. *Id.* at 293.

## II. STANDARD OF REVIEW

The factual findings of the Commissioner shall be conclusive so long as they are based upon substantial evidence and there is no legal error. 42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008). This Court may "set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted); *see also Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1098 (9th Cir. 2014).

Substantial evidence is "'more than a mere scintilla[,] but not necessarily a preponderance.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Connett v. Barnhart*, 340 F.3d 871, 873 (9th Cir. 2003)); *see also Garrison v. Colvin*, 759 F.3d 995, 1009 (9th Cir. 2014). Further, substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Parra v. Astrue*, 481 F.3d 742, 746 (9th Cir. 2007). Where "the evidence can support either outcome, the court may not substitute its judgment

for that of the ALJ." *Tackett*, 180 F.3d at 1098 (citing *Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992)); *see also Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007). Moreover, the court may not focus on an isolated piece of supporting evidence, rather it must consider the entirety of the record weighing both evidence that supports as well as that which detracts from the Secretary's conclusion. *Tackett*, 180 F.3d at 1098 (citations omitted).

### III. ANALYSIS
#### A. *The Five-Step Evaluation*

The Commissioner follows a five-step sequential evaluation process to assess whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4). This process is defined as follows: Step one asks is the claimant "doing substantial gainful activity[?]" If yes, the claimant is not disabled; step two considers if the claimant has a "severe medically determinable physical or mental impairment[.]" If not, the claimant is not disabled; step three determines whether the claimant's impairments or combination thereof meet or equal an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App.1. If not, the claimant is not disabled; step four considers the claimant's residual functional capacity and past relevant work. If claimant can still do past relevant work, then he or she is not disabled; step five assesses the claimant's residual functional capacity, age, education, and work experience. If it is determined that the claimant can make an adjust6ment to other work, then he or she is not disabled. 20 C.F.R. § 404.1520(a)(4)(i)-(v).

In the instant case, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2015, and had not engaged in substantial gainful activity since his alleged onset date of June 25, 2009. AR at 29. At step two of the sequential evaluation, the ALJ found that "from June 25, 2009 to September 3, 2013, the claimant had the following medically determinable impairments: depression, anxiety, and Hidradenitis Suppurativa (20 CFR 404.1522 *et seq.* and 416.922 *et seq.*)." *Id.* The ALJ further found that "the claimant did not have an impairment or combination of impairments

that significantly limited (or is expected to significantly limit) the ability to perform basic work-related activities for 12 consecutive months; therefore, the claimant did not have a severe impairment or combination of impairments from June 25, 2009 to September 3, 2013 (20 CFR 404.1522 *et seq.* and 416.922 *et seq.*)." *Id.* at 29–30. The ALJ next found that "[s]ince September 4, 2013, the claimant has had the following severe impairments: depressive disorder; generalized anxiety disorder with panic and agoraphobia; alcohol use disorder, in remission (20 CFR 404.1520(c) and 416.920(c))." *Id.* at 32. The ALJ then found that "[b]eginning September 4, 2013, the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926)." *Id.* at 37. Prior to step four and "[a]fter careful consideration of the entire record," the ALJ determined that "beginning September 4, 2013, the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: no contact with the [public]; occasional interaction with coworkers and supervisors, with no tandem tasks; needs to work in a setting with access to a restroom; avoid any fast-paced production work where there is a timed quota involved." AR at 38. At step four, the ALJ found that "[t]he claimant is unable to perform past relevant work (20 CFR 404.1565 and 416.965)." *Id.* at 43. At step five, the ALJ found that after "[c]onsidering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a))." *Id.* at 44. Accordingly, the ALJ determined that Plaintiff was not disabled. *Id.*

Plaintiff asserts that the ALJ erred in failing to consider Listing 8.06 for Hidradenitis suppurativa, for failing to adequately assess his needs regarding Hidradenitis suppurativa in the RFC, and by impermissibly relying on a limitation in her RFC that accounts for work in an accommodated position. *See* Opening Br. (Doc. 18).

. . .

### B. *Listing 8.06*

Plaintiff argues that the ALJ erred in failing to consider Listing 8.06 for his Hidradenitis suppurativa diagnosis. Opening Br. (Doc. 18) at 8–9.

Listing 8.06 provides: "*Hidradenitis suppurativa*, with extensive skin lesions involving both axillae, both inguinal areas or the perineum that persist for at least 3 months despite continued treatment as prescribed." 20 C.F.R. § 404, Subpart P, App. 1 at § 8.06. The regulations further explain that "[t]hese listings are only examples of common skin disorders that we consider severe enough to prevent you from engaging in any gainful activities." 20 C.F.R. § 404, Subpart P, App. 1 at § 8.00(H)(1). Moreover, if a claimant does "not have continuing treatment as prescribed, if [the claimant's] treatment has not lasted for at least 3 months, or if [the claimant] do[es] not have extensive skin lesions that have persisted for at least 3 months, [their] impairment cannot meet the requirements of these skin disorder listings." *Id.*

As an initial matter, Plaintiff admits that "the records cited above do not by themselves establish that Mr. Coffey's extensive lesions involving both axillae persisted for at least three months, or whether Mr. Coffey was able to begin treatment with Humira as his physician planned[.]" Opening Br. (Doc. 18) at 9. The claimant bears the burden to show medical evidence consisting of signs, symptoms, and laboratory findings to establish a medically determinable physical or mental impairment. *Ukolov v. Barnhart*, 420 F.3d 1002, 1004-05 (9th Cir. 2005); 20 C.F.R. §§ 404.1512, 404.1520, 416.912, 416.920; *see also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

Here, the ALJ carefully reviewed Plaintiff's history of Hidradenitis suppurativa and concluded that for purposes of the adjudication the condition was non-severe. AR at 36. Plaintiff's arguments that the ALJ failed to develop the record are unavailing and improperly attempt to shift his burden to the ALJ. "An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence. *Mayes v. Massanari*, 276 F.3d 453, 459–60 (9th Cir. 2001) (citations omitted). "The record before the ALJ was neither ambiguous

nor inadequate to allow for proper evaluation of the evidence." *Id.* at 460. The Court finds that the ALJ did not err and her factual findings were based on substantial evidence, and are therefore conclusive. *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

### C. *RFC Adequacy*

Plaintiff argues that the ALJ erred by including a limitation that he "needs to work in a setting with a restroom" in developing Plaintiff's RFC, as this qualification fails to adequately encompass the time that Plaintiff would be off task. Opening Br. (Doc. 18) at 9–10. Plaintiff relies on cases in the context of Crohn's disease for this proposition. *Id.* at 10. Plaintiff's reliance is misplaced. In the cases he cites, the evidence suggested frequent and/or lengthy trips to the restroom. Here, the medical record is devoid of any suggestion that Plaintiff would be required to frequently use the restroom during working hours and Plaintiff's own testimony was that while working at Costco, he would "jet out to the car real quick" to change clothes. AR at 93. The record does not contain any evidence to suggest that Plaintiff would be off-task more than the five (5) to ten (10) percent tolerance suggested by VE Kramer. *Id.* at 111.

### D. *Accommodation Contained in RFC*

Plaintiff argues that "the ALJ's limitation to 'access to a restroom' suggests that Mr. Coffey is to be given something that other employees are not given; that is, a reasonable accommodation such as is contemplated by the Americans with Disabilities Act (ADA)." Opening Br. (Doc. 18) at 11. "Where the testimony of a VE is used at Step Five, the VE must identify a specific job or jobs in the national economy having requirements that the claimant's physical and mental abilities and vocational qualifications would satisfy." *Osenbrock v. Apfel*, 240 F.3d 1157, 1162–63 (9th Cir. 2001). Unlike the cases cited by Plaintiff, VE Kramer did not mention that Plaintiff's accommodations would preclude work or that he needed additional accommodation to perform the jobs suggested. The Court finds that the ALJ did not err in Plaintiff's RFC.

## IV. CONCLUSION

In light of the foregoing, the Court finds that the Commissioner's findings are based upon substantial evidence and without legal error. Therefore, the Court affirms the ALJ's decision.

Accordingly, IT IS HEREBY ORDERED that:

1) Plaintiff's Opening Brief (Doc. 18) is DENIED;

2) The Commissioner's decision is AFFIRMED; and

3) The Clerk of the Court shall enter judgment, and close its file in this matter.

Dated this 24th day of September, 2019.

Honorable Bruce G. Macdonald
United States Magistrate Judge